ELECTA B. MERRILL vs. JAMES W. HODSON ET AL.

Third Judicial District, Bridgeport, April Term, 1914.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

The furnishing of food and drink by a restaurant keeper to a customer for his immediate consumption upon the premises, does not involve a sale of the food, either at common law or under our Sales Act (Public Acts of 1907, Chap. 212),—which is practically declaratory of the pre-existing law; and therefore § 15 of the Act, relating to an implied warranty of quality or fitness of an article sold, can afford no foundation for an action, by the customer against the restaurant keeper, which proceeds upon the theory of a sale of the food and seeks to hold the restaurant keeper liable upon the ground that he had impliedly warranted the food ordered to be fit and wholesome.

An action of negligence is, *it seems*, the only remedy for the consequences of eating unwholesome food supplied by an innkeeper or restaurant keeper in the regular course of his business.

Argued April 16th—decided July 13th, 1914.

ACTION to recover damages for ptomaine poisoning alleged to have been caused by unwholesome food furnished to the plaintiff by the defendants, as restaurant keepers, in violation of an implied warranty of its fitness, brought to the Superior Court in New Haven County and tried to the jury before *Burpee, J.;* verdict and judgment for the plaintiff for $6,500, and appeal by the defendants. *Error and new trial ordered.*

*William Brosmith* and *Robert C. Dickenson,* for the appellants (defendants).

*Ulysses G. Church,* with whom was *Edward R. Reiley,* for the appellee (plaintiff).

PRENTICE, C. J. The complaint charges, and the plaintiff claims·to have proved, that the defendants,

Merrill v. Hodson.

as copartners, conducted a restaurant where they prepared and served to their customers food for immediate consumption on the premises; that the plaintiff visited their restaurant, and ordered from the bill of fare, for immediate consumption, a dish designated thereon as "creamed sweetbreads"; that in response to the order a dish known by that name was served to her, prepared and ready to be eaten by her; that the food so served was not wholesome or fit to be eaten; that the plaintiff ate the food, and that as a consequence, and by reason of the unwholesomeness of the food provided, she was made sick and suffered severely in her health.

It is alleged that the food served was "sold" to the plaintiff, and that its sale was attended with the implied warranty that it was wholesome and fit for consumption. There is no allegation, or pretended proof, of either an express warranty of quality, or of knowledge on the part of the defendants of the unwholesome character of the food served, or of any of its ingredients, or of the defendants' negligence in the premises.

The plaintiff's right to recover was, in both pleading and proof, made to rest on the existence of an implied warranty of quality attending the furnishing of the food. If there was no such implied warranty the plaintiff was not entitled to a verdict, and cannot recover under her complaint.

A question underlying the case is thus presented as to the existence of such warranty. This question was presented to the court in the defendants' motion for a direction of a verdict, in their request to charge, and in their motion in arrest of judgment. Upon each of these occasions the court was asked to rule, in substance, in the language of the requests to charge, that "the furnishing of food to a customer by restaurant keepers, like these defendants, does not constitute a

sale within the meaning of the Sales Act," and that "there is no implied warranty by a restaurant keeper as to the quality of food furnished to a customer."

The court entertained a different view, expressed in its instructions to the jury in part as follows: "If, then, you do find those two things—first, that she made known in some way to these defendants the purpose for which she ordered this food; and that next, she relied upon their skill or judgment to provide it—then the law is such that there is an implied warranty that the goods shall be fit and wholesome for the purpose for which she ordered them. To use the language of the statute: 'there is an implied warranty that the goods shall be reasonably fit for such purpose'; that is, for the purpose for which they were ordered."

This view conformed to the plaintiff's claim and contention, and to the theory upon which the complaint was framed, to wit: that the transaction in the course of which the food was supplied involved a sale of the food as goods within the meaning of our Sale of Goods Act, chapter 212 of the Public Acts of 1907, with the consequence that the provisions of § 15 of that Act respecting implied warranty of quality were applicable to it. The court was mistaken in this fundamental proposition.

The Act defines a sale of goods as "an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price." § 1. A transaction, to come under the provisions of the Act, must, therefore, be one which concerns "goods," and one which involves a transfer to the purchaser of the property therein. "Goods" are, in the Act, defined to include "all chattels personal other than things in action and money," and it is added that the term "includes emblements, industrial growing crops, and things attached to or forming part of the land which

are agreed to be severed before sale or under the contract of sale." § 76. By "property" is meant "the general property in goods, and not merely a special property." § 76. Transactions within the provisions of the Act are thus limited to those embodying an agreement whereby a seller transfers the general property in chattels personal, as that term is defined, other than things in action and money, to a buyer for a consideration called the price.

A restaurant keeper differs from an innkeeper in that he furnishes only food, or food and drink, and not lodging or shelter. Beale on Innkeepers, §§ 35, 301. In so far as the character of the service performed by a restaurant keeper and innkeeper to their respective patrons is concerned, it is the same. In *Saunderson* v. *Rowles*, 4 Burrows, 2064, 2068, Lord Mansfield, commenting upon this fact, observed that "the analogy between the two cases of an innkeeper and a victualler is so strong that it cannot be got over." In neither case does the transaction, in so far as it involves the supply of food or drink to customers, partake of the character of a sale of goods. The essence of it is not an agreement for the transfer of the general property of the food or drink placed at the command of the customer for the satisfaction of his desires, or actually appropriated by him in the process of appeasing his appetite or thirst. The customer does not become the owner of the food set before him, or of that portion which is carved for his use, or of that which finds a place upon his plate or in side dishes set about it. No designated portion becomes his. He is privileged to eat and that is all. The uneaten food is not his. He cannot do what he pleases with it. That which is set before him or placed at his command is provided to enable him to satisfy his immediate wants, and for no other purpose. He may satisfy those wants; but there he must stop. He

may not turn over unconsumed portions to others at his pleasure, or carry away such portions. The true essence of the transaction is service in the satisfaction of a human need or desire—ministry to a bodily want. A necessary incident of this service or ministry is the consumption of the food required. This consumption involves destruction, and nothing remains of what is consumed to which the right of property can be said· to attach. Before consumption title does not pass; after consumption there remains nothing to become the subject of title. What the customer pays for is a right to satisfy his appetite by the process of destruction. What he thus pays for includes more than the price of the food as such. It includes all that enters into the conception of service, and with it no small factor of direct personal service. It does not contemplate the transfer of the general property in the food supplied as a factor in the service rendered.

Professor Beale, in his work on Innkeepers, § 169, well analyzes and states the situation as follows: "As an innkeeper does not lease his rooms, so he does not sell the food he supplies to the guest. It is his duty to supply such food as the guest needs, and the corresponding right of the guest is to consume the food he needs and to take no more. Having finished his meal, he has no right to take food from the table, even the uneaten portion of food supplied to him; nor can he claim a certain portion of food as his own, to be handed over to another in case he chooses not to consume it himself. The title to food never passes as a result of an ordinary transaction of supplying food to a guest."

For the reasons thus stated, the English courts have held that an innkeeper was not a trader, and so not within the provisions of existing bankrupt laws. In *Crisp* v. *Pratt*, 3 Cro. Car. 549, it was said, in connection with such a ruling, that "an innholder doth

not get his living by buying and selling; for although he buy provisions to be spent in his house, he doth not properly sell it, but utters it at such rates as he thinks reasonable gains, and the guests do not take it at a certain price, but they may have it or refuse it if they will."

In *Saunderson* v. *Rowles*, 4 Burrows, 2064, Lord Mansfield having observed, as already indicated, that a victualler and innkeeper stood in the same position in the matter of buying and selling, added (p. 2068): "And we are all clear, that this man [a victualler] is not within these laws; upon the authority of the determined case of an innkeeper, and also upon the reason of the thing. He makes no particular contract, like a trader. He cannot be said to get his living by buying and selling, as a trader does. He buys, only to spend in his house: and when he utters it again, it is attended with many circumstances additional to the mere selling price."

In *Parker* v. *Flint*, 12 Mod. 254, 255, it was said that "an innkeeper, as such, can not be a bankrupt, because he does not sell but utters his provision."

Other cases, to the effect that an innkeeper is not a trader, are *Newton* v. *Trigg*, 3 Mod. 327, 330; *Harman* v. *Clarkson*, 22 U. C. C. P. 291.

The transaction between the plaintiff and the defendants did not involve a sale of goods, and the provisions of § 15 of the Sales Act, relied upon as creating an implied warranty of quality, furnish no foundation for a right of action.

The situation was not different at common law. Our Sale of Goods Act has not, either in its definition of a sale, or its provisions for implied warranty of quality, departed from the common law in any respect pertinent to this case. This becomes clear from a comparison of the common-law rule and those furnished by the Act. Benjamin, in his work on Sales (7th Ed. § 1), defines a

common-law sale of personal property as "a transfer of the absolute or general property in a thing for a price in money." In the leading case of *Jones* v. *Just* (1868), L. R. 3 Q. B. 197, 202, Mellor, J., stated at length the common-law rules touching the subject of implied conditions or warranties. The fourth he stated as follows: "Where a manufacturer or dealer contracts to supply an article which he manufactures or produces, or in which he deals, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment or skill of the manufacturer or dealer, there is in that case an implied term or warranty that it shall be reasonably fit for the purpose to which it is to be applied. . . . In such case the buyer trusts to the manufacturer or dealer, and relies upon his judgment and not upon his own."

It is difficult to discover in what particular of present importance a substantial change in the law has been wrought by our recent legislation. This is not surprising, since our Act, in its pertinent provisions, does not differ substantially from the English Act, either in its definition of a sale, or in respect to the subject of implied warranty of quality; and the English Act was, as its author has said, the result of an endeavor to reproduce as exactly as possible the existing law. Chalmers' Sale of Goods (7th Ed.) Introduction, viii. While there is in our Act some departure from the phraseology of the English touching these subjects, the changes in substance are slight, and they all concern matters irrelevant to the present situation. In fact the similarity in expression is such as to forcibly suggest that § 15 of our Act, which deals with the subject of implied warranty of quality, was, with slight changes here immaterial, taken directly from its English predecessor.

This being the case, we may safely look for light in

resolving the question before us to common-law cases as well as to any which may have arisen under the modern sales legislation. As far as we are aware no case of the latter sort, save the present, has ever reached an appellate tribunal. Of common-law cases we find the following four: *Sheffer* v. *Willoughby*, 163 Ill. 518, 45 N. E. 253; *Crocker* v. *Baltimore Dairy Lunch Co.*, 214 Mass. 177, 100 N. E. 1078; *Pantaze* v. *West*, 7 Ala. App. 599, 61 So. 42; *Doyle* v. *Fuerst & Kraemer*, 129 La. 838, 56 So. 906. In all of them the right of action was based upon negligence. We know of no case, aside from the present, in which an attempt has ever been made, in cases brought to recover for the harmful consequences resulting from unwholesome food or drink supplied by the keeper of an inn, restaurant, or boarding-house, in the line of his business, to recover upon the strength of an implied condition or warranty of quality. Those which have grown out of a sale of provisions by a dealer are, of course, not in point. In the first of the cited cases the obligations of a restaurant keeper are discussed, and a statement of the law made which very plainly means, and has been generally understood to mean, that the only remedy for the consequences of eating unwholesome food supplied by an innkeeper or restaurant keeper in the regular course of his business is one for lack of due care. Beale on Innkeepers, §§ 169, 302, so states the law. See, to the same effect, 22 Cyc. 1081; 16 Amer. & Eng. Ency. of Law (2d Ed.) 547.

In *Bigelow* v. *Maine Central R. Co.*, 110 Me. 105, 85 Atl. 396, action was brought against the defendant for the consequences to the plaintiff of her having eaten unwholesome canned asparagus served to her in the defendant's dining-car. The declaration was in case, and its allegation was that the defendant was negligent. Notwithstanding this statement of the pleadings, the plaintiff contended that she was under no duty to show

either privity of contract or negligence, since there was an implied warranty of wholesomeness, and the defendant was an insurer of the quality of the asparagus. The court held that, in any event, the defendant could not be held to be an insurer of the quality of canned goods or a warrantor of it, and for that cause directed judgment for the defendant. This case, followed by *Trafton v. Davis,* 110 Me. 318, 86 Atl. 179, presents an aspect of the subject of implied warranty under common-law principles which does not concern us, and in its disposition no light is shed upon the views of the court as to whether there would have been an implied warranty had the food served not been canned goods.

Reasons of appeal for other causes than that discussed call for no consideration, since the plaintiff must fail in her action.

There is error, the judgment is set aside, and a new trial ordered.

In this opinion the other judges concurred.